UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HENDERSON CLARKE,

                        Plaintiff,

    -against-

DET. CAMILO R. ANTONINI, *Badge No. D111*,
DET. SGT. SEAN J. FEGAN, *Badge No. DS001*,
THE CITY OF MOUNT VERNON, P.O. PATRICK
KING, *Badge No. 2113*, P.O. HOWARD, *Badge No. 2163*, UNIDENTIFIED WESTCHESTER
COUNTY DEPARTMENT OF PUBLIC SERVICE
NARCOTICS EMPLOYEES AND OFFICERS, and
UNIDENTIFIED MOUNT VERNON POLICE
DEPARTMENT EMPLOYEES AND OFFICERS,

                        Defendants.

No. 21 Civ. 1877 (NSR)
OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **03/29/2024**

NELSON S. ROMÁN, United States District Judge:

      Plaintiff Henderson Clarke brings this civil rights action asserting a variety of claims under 42 U.S.C. § 1983 and New York State law, alleging that he was falsely arrested and maliciously prosecuted for selling crack cocaine to an undercover police officer in Mount Vernon, New York—an offense he could not have committed because he was in North Carolina at the time of the alleged offense. He sues Defendants the City of Mount Vernon, Det. Camilo R. Antonini, Det. Sgt. Sean J. Fegan, P.O. Patrick King, and P.O. Howard (collectively, the "City Defendants"), as well as unidentified employees and officers from the Mount Vernon Police Department and the Westchester County Department of Public Safety.[1]  ("SAC," ECF No. 57.)

      Before the Court is the City Defendants' partial motion to dismiss (ECF No. 63) pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants in part and denies in part the City Defendants' motion.

---

[1] Although Plaintiff's Second Amended Complaint ("SAC") names the County of Westchester (the "County") as a Defendant, Plaintiff voluntarily dismissed the County as a Defendant. (ECF Nos. 57 and 62.)

# BACKGROUND

## I.   Factual Background

The Court assumes familiarity with the facts in this matter. *See Clarke v. Antonini*, No. 21 CIV. 1877 (NSR), 2022 WL 4387357, at * 1 (S.D.N.Y. Sept. 22, 2022). The Court includes those facts relevant to the motion and summarizes them below to accurately reflect the allegations in the Second Amended Complaint ("SAC"). For purposes of the City Defendants' motion, the allegations in the SAC are taken as true and construed in the light most favorable to Plaintiff at this stage.

### A.   *The Defendant Officers Conspire to Fabricate False Documentation and Evidence Against Plaintiff*

On July 26, 2017, while Plaintiff was visiting family in North Carolina, officers Antonini, Fegan, King, Howard, and other unidentified officers from the Mount Vernon Police Department ("MVPD") and from the Westchester County Department of Public Safety ("WCDPS") (collectively, the "Defendant Officers"), were conducting an undercover narcotics sting operation in Mount Vernon, New York. (SAC ¶¶ 20–22.) As part of this operation, the Defendant Officers conspired together to falsely claim and produce sworn paperwork that Plaintiff sold narcotics to an undercover officer from the WCDPS in the City of Mount Vernon. (*Id.* ¶¶ 23–24.) Specifically, the Defendant Officers fabricated false official documents—including sworn police reports, evidence vouchers, and photocopies of cash that Plaintiff allegedly used as "buy money"—and false evidence—including five clear plastic knotted twists of crack cocaine and $100 in "buy money"—all of which the Defendant Officers used for filing of a false felony complaint dated April 24, 2018. (*Id.* ¶¶ 24–25, 29.)

B.      *Plaintiff is Falsely Arrested and Maliciously Prosecuted*

On May 7, 2018, the Westchester County District Attorney's Office (the "County DA's Office") issued a press release announcing twenty-two arrests in a multi-jurisdiction drug sweep and identifying six more individuals, including Plaintiff, who were not arrested but for whom arrest warrants had been issued. (*Id.* ¶ 30.) Former Mount Vernon Mayor Richard Thomas also held a press conference announcing the arrests, during which he explained that they were part of "Operation Crackdown," a yearlong investigation by various law enforcement agencies, including the MVPD and the Westchester County Police Department ("WCPD"). (*Id.* ¶¶ 31-32.) Plaintiff's name and likeness was publicized in connection with Operation Crackdown, which Mayor Thomas repeatedly linked to terrorism against the United States, and his photograph was included on the County DA's Office website. (*Id.* ¶¶ 33, 37.)

Nearly a year later, on July 23, 2019, based on the false documents and evidence they fabricated, the Defendant Officers arrested Plaintiff in White Plains, New York despite him repeatedly asserting his innocence to them. (*Id.* ¶¶ 37–44.) The Defendant Officers forwarded the false documents and evidence they fabricated to the County DA's Office and also withheld exculpatory evidence. (*Id.* ¶¶ 45, 48.) As a result of these actions, the County DA's Office charged Plaintiff with violating N.Y. Penal Law § 220.39(1), Criminal Sale of a Controlled Substance in the Third Degree, a Class B Felony. (*Id.* ¶ 52.) On July 26, 2019, Plaintiff entered a plea of not guilty through counsel and Plaintiff was incarcerated or five days until he was released on bail. (*Id.* ¶¶ 54–55.) At all times relevant to the SAC, the Defendant Officers were aware of Mr. Clarke's innocence and that no probable cause existed to arrest Mr. Clarke. (*Id.* ¶¶ 41, 46.)

On September 16, 2019, the Defendant Officers took affirmative steps to cause a Superseding Misdemeanor Information to be filed against Plaintiff based on false and fabricated official documents and evidence. (*Id.* ¶ 57.) The Superseding Misdemeanor Information charged

3

Plaintiff with violating N.Y. Penal Law § 220.03, Criminal Possession of a Controlled Substance in the Seventh Degree, a Class A Misdemeanor. (*Id.* ¶ 58.) On January 9, 2020, the prosecution ultimately dismissed all criminal charges against Plaintiff. (*Id.* ¶ 61.) Other arrests made in connection with "Operation Crackdown" were similarly resolved by dismissal or very favorable plea deals. (*Id.* ¶ 64.)

> C.      *Plaintiff's False Arrest and Malicious Prosecution Resulted from the City and County's Unconstitutional Policies, Customs, or Practices and Other Failures*

> Plaintiff claims all of the above

> occurred as a direct result of the unconstitutional policies, customs, or practices of the Defendant[] City of Mount Vernon . . . , including, without limitation, the inadequate screening, hiring, retaining, training, and supervising of its employees, and pursuant to customs or practices of falsely arresting individuals, the falsification of evidence, and the failure to investigate or address allegations of police misconduct and abuse by the Defendant[] City of Mount Vernon . . . .

(*Id.* ¶ 63.)

Plaintiff alleges that the Commissioner of Public Safety and/or the MVPD Chief of Police are the policymakers for the City with respect to arrests and criminal prosecutions conducted by police officers. (*Id.* ¶ 65.) Plaintiff further claims that his false arrest and malicious prosecution is not an isolated incident, as the City "has a widespread practice of fabricating evidence to secure false indictments." (*Id.* ¶ 67.) This illegal misconduct includes MVPD officers: "(1) falsely claiming that that they had obtained information from a confidential informant to secure search warrants, arrests, and criminal prosecutions; (2) planting false evidence, such as drugs, crack pipes or other drug paraphernalia to secure arrests; [and] (3) preparing official police reports, warrant affidavits or testifying in court to the false and fabricated evidence." (*Id.*) Plaintiff further identifies specific instances of alleged misconduct to illustrate this pattern:

- Reginald Gallman**:** On March 31, 2017**,** During the execution a search warrant at her home of by MVPD police officers, Michelle Campbell had drugs found on her

person after an unlawful strip search. Despite Ms. Campbell admitting that the drugs were hers, Detective Antonini prepared a fabricated police report falsely claiming that he observed Reginald Gallman hand drugs to Ms. Campbell. This false report was used to indict Mr. Gallman. In November 2018, Mr. Gallman filed a lawsuit claiming evidence had been falsified against him. (*Id.* ¶¶ 69–72.)

- Johnathan Long: In December 2017, MVPD officers, including Detective Antonini, planted crack cocaine in a flower bed to manufacture evidence for the arrest of Johnathan Long. (*Id.* ¶ 73.)

- Whistleblower Officer Murashea Bovell: In 2014 and 2015, MVPD officer Murashea Bovell reported to the City and its policymakers about misconduct within the MVPD, including framing residents and collaborating with drug dealers. The City and its policymakers took no action in response, so Officer Bovell began secretly recording his fellow MVPD officers. In February 2019, Officer Bovell provided the tapes to the County DA's Office. The recordings included MVPD narcotics officer John Campo recounting instances of officers fabricating evidence to secure false arrests and MVPD officer Avion Lee recounting how, on her sergeant's orders, MVPD officers manufactured a false report of a hand-to-hand drug purchase to cover up the use of excessive force. (*Id.* ¶¶ 74–77.)

Plaintiff alleges that the City and policymakers were on notice of the alleged widespread practice prior to Plaintiff's false arrest in July 2019 because (1) Mr. Gallman's lawsuit was filed in November 2018; (2) Officer Bovell provided the secret recordings to the County DA's Office in February 2019; (3) Officer Campo provided the City and its policymakers with information regarding MVPD officers planting drugs and fabricating search warrants prior to February 2018;

and (4) the City and its policymakers had notice of all civilian complaints of MVPD officer misconduct. (*Id.* ¶¶ 79–83, 89.) Plaintiff furthers points to separate ongoing investigations by the County DA's Office, the United States Department of Justice Civil Rights Division ("DOJ Civil Rights Division"), and Special Prosecutor William Wagstaff into the MVPD for officer misconduct, including the falsification of evidence. (*Id.* ¶¶ 84–88.) Plaintiff claims that this widespread practice and the City and its policymakers' failure to take action in response was the "moving force" behind Plaintiff's false arrest as the Defendant Officers, including Detective Antonini and Sergeant Fegan "believed that they could manufacture false evidence to secure drug arrests without suffering any discipline or repercussion for doing so." (*Id.* ¶ 92.)

Finally, Plaintiff alleges that prior to his arrest, the City had a policy of failing to adequately train MVPD officers on making arrests and conducting prosecutions, despite knowing that such training reduces constitutional violations by MVPD officers. (*Id.* ¶¶101–102.) Plaintiff claims that the City and its policymakers were aware of the policy of failing to train MVPD officers on: "searching of detainees and arrestees; collecting, documenting, preserving, testing, and disclosing evidence; writing police reports and taking of investigative notes; obtaining statements and testimony from witnesses; maintaining investigative files and disclosing those files in criminal proceedings; not planting evidence; not fabricating evidence; and not framing innocent people." (*Id.* ¶¶ 104–111.) The City and its policymakers were allegedly on notice of the inadequate training program due to pending and settled civil rights lawsuits. (*Id.* ¶ 112.) As a result of the City and its policymakers' failure to act, Plaintiff alleges he suffered violations of his civil rights.

## II.   Procedural Background

On March 3, 2021, Plaintiff commenced the instant action by filing a complaint against the City Defendants; the County of Westchester (the "County"); Commissioner Martin J. McGlynn; Commissioner Thomas A. Gleeson; Commissioner Shawn Harris; Commissioner Glenn Scott;

Unknown Westchester County Department of Public Safety Narcotics Employees and Officers; and Unknown Mount Vernon Police Department Employees and Officers. (Compl., ECF No. 1.) On May 7, 2021 and May 10, 2021, the named Defendants sought leave to file motions to dismiss the Complaint. (ECF Nos. 27, 28.) On June 29, 2021, pursuant to a joint stipulation between the parties, Plaintiff filed his First Amended Complaint ("FAC"), which removed all claims asserted against Commissioners McGlynn, Gleeson, Harris, and Scott. (FAC, ECF No. 35.) On November 2, 2021, pursuant to the briefing schedule set by the Court, the City Defendants and the County each filed motions to dismiss the Complaint. (ECF Nos. 45, 49.) On September 22, 2022, the Court granted in part and denied in part the City Defendants partial motion to dismiss and the County's motion to dismiss, and granted Plaintiff leave to file an amended complaint. (ECF No. 56.) On October 24, 2022, Plaintiff filed his SAC. (ECF No. 57.)

On November 18, 2022, the City Defendants again sought leave to file a partial motion to dismiss the SAC, which the Court granted the same day. (ECF Nos. 58, 59.) On April 3, 2023, the parties' respective filings on the instant motion were fully briefed: the City Defendants filed their notice of motion (ECF No. 63), an accompanying declaration with exhibits ("Loomba Decl.," ECF No. 64), memorandum in support ("City Defs. Mem.," ECF No. 65), and reply ("City Defs. Reply," ECF No. 67); and Plaintiff filed his response in opposition ("Pl. Opp.," ECF No. 66).

## LEGAL STANDARD

### I.   Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Freidus v. Barclays Bank PLC,* 734 F.3d 132, 137 (2d Cir. 2013). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action will not do"; rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. In applying these principles, the Court may consider facts alleged in the complaint and documents attached to it or incorporated by reference. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks and citation omitted).

## II.    42 U.S.C. § 1983 Claims

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). To state a claim under § 1983, a plaintiff must allege two essential elements: "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.'" *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).

### A.    Municipal Liability Under Monell

"Congress did not intend municipalities to be held liable [under Section 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Social Svcs. of City of New York*, 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under [Section] 1983 based on acts of a public official, a plaintiff is required to

8

prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008), *cert. denied*, 558 U.S. 933 (2009).

The fifth element reflects the notion that "a municipality may not be held liable under [Section] 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under Section 1983 "by application of the doctrine of *respondeat superior*." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity itself commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

## DISCUSSION

By their partial motion to dismiss, the City Defendants seek to dismiss Plaintiff's *Monell* and *respondeat superior* claims against the City for failure to state a claim upon which relief can be granted. (*See* City Defs. Mem. at 9–17.) Specifically, the City Defendants argue that Plaintiff fails to cure the deficiencies in his FAC because he again (1) fails to allege that the "widespread

practice" of falsifying evidence and reports was the "moving force" behind the alleged constitutional violations and (2) fails to identify either a specific policymaker who knew about the need for additional training or a specific deficiency in the training program. (City Defs. Mem. at 13–14.)

By their moving papers, the parties appear to limit their dispute to a few narrow issues. In his opposition, Plaintiff raises only three arguments challenging the City Defendants' partial motion to dismiss his *Monell* claim, namely that he plausibly alleged: (1) the City and its policymakers had notice of the widespread practice and were deliberately indifferent to it; (2) the widespread practice was the moving force behind the violation of his constitutional rights; and (3) the City's failure to train MVPD officers caused Plaintiff's injuries. (Pl. Opp. at 10–20.)

As such, the Court limits its analysis to assessing Plaintiff's *Monell* claim based on either a widespread policy or practice or the City's failure to train and supervise its employees as well as his claim for *respondeat superior* liability. *Nemes v. Dick's Sporting Goods, Inc.*, 521 F.Supp.3d 328, 347 (S.D.N.Y. 2021) ("Where a counseled party submits a partial opposition, a court may, when appropriate, infer that relevant claims or defenses left undefended are abandoned.") For the reasons that follow, the Court finds Plaintiff successfully cures the deficiencies in alleging a widespread policy or practice, but again fails to plausibly allege a claim for failure to train or supervise.

## I.   *Monell* Claims

### A.   *Applicable Law*

In determining municipal liability under *Monell*, courts in the Second Circuit apply a two-step test. First, a plaintiff must "prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer." *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (citation

omitted), *cert. denied*, 480 U.S. 916 (1987). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

> A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:
>
> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).

After establishing the existence of a municipal policy or custom, a plaintiff must then establish a causal link between it and the alleged constitutional injury. *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis omitted)); *Roe*, 542 F.3d at 37 (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury" (quoting

*Brown*, 520 U.S. at 404)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity.").

 B.  *"Widespread Policy or Practice"*

 In its prior Opinion, the Court held Plaintiff sufficiently alleged the existence of a widespread practice, but ultimately dismissed Plaintiff's *Monell* claims because his "boilerplate allegations of causation" were insufficient to defeat the City Defendants' motion to dismiss. Basing its decision primarily on news articles discussing other factually similar incidents of MVPD officers' misconduct that Plaintiff's FAC incorporated by reference, the Court held that "Plaintiff sufficiently allege[d] that MVPD officers have engaged in a widespread practice or custom that constitutes an official policy of the City due to its inaction, acquiescence, or tacit approval." *Clarke*, 2022 WL 4387357, at *8 (citing *City of Canton v. Harris*, 489 U.S. 378, 395 (1989)). That said, the Court determined Plaintiff still fell short of pleading a *Monell* claim based on this theory because Plaintiff failed to plead facts proving the City policymakers had notice of this municipal policy and how exactly the City "tacitly approved" of such policy. *Id.* at 11. Plaintiff and the City Defendants, of course, dispute whether Plaintiff has cured these deficiencies his SAC.

 The City Defendants argue Plaintiff's SAC still fails to plausibly allege the who, when, and how with respect to the City and its policymakers having notice of the widespread practice of MVPD officers falsifying evidence. (City Defs. Mem. at 13-14.) Moreover, the City Defendants claim that while Plaintiff had identified ongoing investigations into MVPD officer misconduct, Plaintiff had failed to allege any such investigation has concluded or otherwise resulted in a finding of a widespread practice of falsifying evidence to support drug arrests. (*Id.* at 14.) With respect to Plaintiff's acquiescence theory, the City Defendants argue Plaintiff still has not plead any factual allegations in support of his claim. (*Id.* at 14-15.)

In response, Plaintiff argues that his factual allegations regarding two officers reporting specific types of misconduct, the City policymakers receiving notice of civilian complaints, and Defendants Antonini's and Fegan's disciplinary history are sufficient. (Pl. Opp. at 13.) Furthermore, Plaintiff argues his acquiescence argument is supported by his allegations that as a result of the City's failure to act, the Defendant officers, including Antonini and Fegan, believed they could falsify evidence without being disciplined or facing any profession repercussions. (*Id.* at 14.)

"*Monell's* policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citation omitted). "The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004). A plaintiff must do more than allege prior misconduct, their allegations must establish "that the City was both 'on notice' of the unconstitutional conduct *and* that it failed to meaningfully investigate the claims." *Demosthene v. City of New York*, No. 18CV1358ARRPK, 2019 WL 181305, at *10 (E.D.N.Y. Jan. 10, 2019) (emphasis in original) (citing *Fiacco*, 738 F.2d at 328).

Plaintiff's allegations supporting his assertion that the City and its policymakers were on notice of MVPD officer misconduct fall into four categories: (1) past and pending civil rights lawsuits; (2) ongoing investigations by the County DA's Office, the DOJ's Civil Rights Division, and Special Prosecutor William Wagstaff; (3) civilian complaints and investigations of allegations of misconduct against Antonini and Fegan; and (4) officers directly reporting MVPD officer

misconduct to the City and its policymakers. (Pl. Opp. at 10-13.) The Court addresses each of these categories of allegations in turn.

First, Plaintiff points to the pending federal civil rights lawsuit filed by Mr. Gallman on November 14, 2018 (SAC ¶ 80; Pl. Opp. at 10.) As a threshold matter, the Court has previously dismissed Plaintiff's reliance on a list of civil lawsuits in its prior Opinion, disregarding three of them for pertaining to different factual issues and the other two for not yet having resulted in an adjudication of liability. *Clarke*, 2022 WL 4387357, at *9 (citations omitted). That reasoning still applies. As noted by the City Defendants, the federal civil rights lawsuit still has not resulted in an adjudication of liability or a finding of fact that Antonini filed a false report. (City Defs. Mem. at 13.) Moreover, the cases cited by Plaintiff in support of this allegation are distinguishable. The plaintiffs in both *White* and *Shepard* relied primarily on DOJ reports containing factual findings and conclusions to support their allegations that defendants committed constitutional violations. *Shepherd v. Powers*, No. 11 CIV. 6860 LTS RLE, 2012 WL 4477241 at *9–10 (S.D.N.Y. Sept. 27, 2012); *White v. City of New York*, No. 13 CIV. 7421 KPF, 2015 WL 4601121, at *8 (S.D.N.Y. July 31, 2015) (plaintiff adequately alleged "use of excessive force against inmates at Rikers Island was sufficiently pervasive that supervisors must have been aware of it, and yet failed to take the necessary actions to curb it.").  Finally, *McCants* is distinguishable because it involved seventeen lawsuits containing allegations similar to those in the plaintiff's complaint demonstrating a pattern of excessive force over a seven-year period. *McCants v. City of Newburgh*, No. 14 CV 556 VB, 2014 WL 6645987, at *4 (S.D.N.Y. Nov. 21, 2014), *clarified on denial of reconsideration*, No. 14 CV 556 VB, 2014 WL 7398910 (S.D.N.Y. Dec. 9, 2014) (plaintiff's detailing of seventeen other lawsuits of similar nature was "evidence the City was on notice to the possible use of excessive force by its police officers on seventeen different occasions"). Plaintiff's reliance on a single

pending federal civil lawsuit is insufficient to support his argument that the City and its policymakers were on notice of MVPD falsifying evidence and conducting false arrests.

The Court reaches the same conclusion with regards to the ongoing investigations by the County DA's Office, the DOJ's Civil Rights Division, and Special Prosecutor William Wagstaff (*id.* ¶¶ 84-88). As with the pending civil lawsuits, these ongoing investigations that have yet to reach or report findings are insufficient to support a widespread policy or practice claim. *Roman v. City of Mount Vernon*, No. 21-CV-2214 (KMK), 2022 WL 2819459, at *22 (S.D.N.Y. July 19, 2022) (the existence of an investigation insufficient to "push [p]laintiff's theory from possible to plausible"); *Joseph v. Doe*, No. 16CV2004PKCLB, 2017 WL 4233024, at *6 (E.D.N.Y. Sept. 22, 2017) (the "mere existence" of an investigation insufficient to establish a policy or custom).

Third, Plaintiff alleges that (1) "[t]he City and its policymakers also received notice of all civilian complaints of any allegations of MVPD officer misconduct but took no action in response" and (2) Antonini and Fegan had been investigated for prior allegations of misconduct and never been disciplined. (SAC ¶¶ 89, 93.) These allegations fall short for a few reasons. At the outset, Plaintiff fails to allege that the complained of misconduct was for the type of misconduct similar to that alleged in his complaint. Moreover, Plaintiff's allegations lack specificity "as to how many complaints were made, to whom, or over what period of time they were made." *Roman*, 2022 WL 2819459 at *21. Finally, while Plaintiff claims Antonini and Fegan had not been disciplined following an investigation, Plaintiff makes no allegations that the investigations were in any way improper, inadequate, or otherwise not meaningful. Accordingly, these allegations remain too vague and conclusory to plausibly plead a claim of a widespread policy or custom. *Clark*, 2022 WL 4387357, at *8; *see also Roman*, 2022 WL 2819459, at 21 ("Having failed to provide more

than a naked assertion devoid of further factual enhancement, Plaintiff cannot sustain a *Monell* claim . . . on the basis of otherwise unsupported allegations of civilian complaints.") (cleaned up).

Finally, the Court reaches Plaintiff's most compelling argument. Plaintiff alleges that in 2014 and 2015, whistleblower Bovell reported to the City and its policymakers that MVPD officers engaged in misconduct such as framing the City's residents and collaborating with drug dealers, (SAC ¶¶ 74); in February 2019, Officer Bovell provided secret recordings to the County DA's Office containing allegations similar to those alleged in the SAC (*id.* ¶¶ 76-77, 81, 113-114); the City and its policymakers received notice of these allegations and received Officer Bovell's secret recordings (*id.* ¶ 82); and in February 2018, upon information and belief, Officer Campo provided the City and policymakers with information regarding MVPD officers planting of drugs and fabricating search warrants (*id.* ¶ 83). Plaintiff further alleges that response to these reports, the City and its policymakers failed to take corrective action, which caused the Defendant Officers to violate Plaintiff's civil rights. (*Id.* ¶¶ 74, 115.)

Taken together and construing Plaintiff's SAC in the light most favorable to him, the Court finds Plaintiff sufficiently alleged that Officer Campo and Officer Bovell put the City and its policymakers "on notice" regarding the widespread practice and policy of MVPD officers falsifying evidence and conducting false arrests. At this stage of the litigation, Plaintiff providing the name of the specific officers reporting to the City and its policymakers and alleging that the misconduct is similar to that alleged by Plaintiff in this action just barely pushes Plaintiff's claims across the line from possible to plausible. Particularly compelling are the allegations that Officer Bovell initially informed the City and policymakers of MVPD officer misconduct in 2014 and 2015, then due to their inaction, secretly recorded officers admitting to the misconduct and then provided those recordings to the City and its policymakers. (SAC ¶¶ 74–75, 114.) The City

Defendants articulated Plaintiff's claim most succinctly: Plaintiff alleges that despite being on notice that MVPD officers had a common and widespread practice of fabricating evidence and falsifying records, the City and its policymakers "allowed such practice to continue, thus fostering a permissive culture whereby it was inevitable that constitutional rights would be violated." (City Defs. Mem. at 14–15.) The Court finds this sufficient for a reasonable inference.

The City Defendants' argument that Plaintiff has not alleged the City and its policymakers were not on notice primarily relies on Plaintiff's failure to identify a specific policymaking official who received notice. (*Id.* at 13; City Defs. Reply at 2.) However, Plaintiff explicitly identifies the policymakers as the Commissioner of Public Safety and/or the MVPD Chief of Police. (SAC ¶ 65.) Furthermore, the Court finds Plaintiff's allegations that the reported misconduct parallels the misconduct giving rise to his claims here are sufficient without the specificity the City Defendants suggest the law requires. (City Defs. Mem. at 13.)

While Plaintiff's allegations are certainly insufficient to survive a motion for summary judgment, these factual allegations are sufficient to plausibly allege the widespread practice of MVPD officers fabricating and falsifying evidence caused Plaintiff's injuries. *Toliver v. City of New York*, 2011 WL 4964665, at *10–11 (S.D.N.Y. Oct. 18, 2011) (finding plaintiff plausibly alleged the City of New York was on notice of detective misconduct). Accordingly, the Court denies the City Defendant's motion to dismiss Plaintiff's *Monell* claim against the City based on the theory of a widespread unlawful practice that constitutes an official policy of the municipality.

### C.     Failure to Train

To support a claim based on failure to train, a plaintiff must show that the municipality's failure is so severe as to constitute "deliberate indifference" to a plaintiff's rights. *See Canton*, 489 U.S. at 388–89. The phrase "deliberate indifference" means more than "simple or even heightened

17

negligence"; it involves a "conscious disregard" on the part of municipal employers for the consequences of their actions. *Brown*, 520 U.S. at 407.

Deliberate indifference is a stringent standard. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). To establish a claim based on such theory,

> a plaintiff must properly plead (1) that a policymaker knows to a moral certainty that her employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights.

*Hawthorne by Hawthorne v. County of Putnam*, 492 F. Supp. 3d 281, 292 (S.D.N.Y. 2020) (quoting *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (internal quotations omitted)). In other words, the plaintiff must show that the need for more or better protocols or supervision to protect against constitutional violations was obvious, such that it amounts to a deliberate choice by the municipality. *See, e.g.*, *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.*

The Court dismissed Plaintiff's claim for failure to provide adequate training or supervision because Plaintiff (1) failed to identify which policymakers knew "to a moral certainty" about the alleged "history of employees mishandling the situation" and was deliberately indifferent to it such that their respective officers would "frequently cause the deprivation of a citizen's constitutional rights" and (2) failed to allege a specific deficiency the City's training. *Clarke*, 2022 WL 4387357, at *12. The Court finds that Plaintiff has failed to cure the deficiencies from his FAC.

Plaintiff's assertions that the City policymakers "knew" and "were aware" that adequate training reduces constitutional violations and that the MVPD had a policy of failing to properly train officers on a laundry list of duties is insufficient to plausibly allege a failure to train. (SAC ¶¶ 100–111.) While the City and its policymakers may have been "on notice" of MVPD officer misconduct by falsifying evidence and executing false arrests by receiving the whistleblower recordings, Plaintiff's allegations fall short of asserting that the City and its policymakers knew to a "moral certainty" about the alleged mishandling of the situation. *Clarke*, 2022 WL 4387357, at 12. Moreover, even if Plaintiff had identified specific deficiencies in the training program, Plaintiff's allegations are insufficient to establish a causal relationship between the deficiencies and the alleged constitutional violations. None of the allegations in Plaintiff's SAC establish that the failure to train itself caused Plaintiff's false arrest, instead of some other cause that could not be attributed to the City. *Amnesty Am.*, 361 F.3d at 130 (affirming dismissal of failure to train claim because plaintiffs "provided no evidence tending to rule out those causes of the excessive force that would not support municipal liability, such as . . . one or more officers' negligent or intentional disregard of their training.")).

Plaintiff continues to make boilerplate allegations that the City failed to train and supervise MVPD officers—the factual allegations he adds to his SAC are nothing more than formulaic recitations of the elements of the cause of action. Plaintiff provides a series of conclusory statements insufficient to support a reasonable inference that Plaintiff's injuries were caused by a failure to train. *See Simms v. City of New York*, 480 Fed.Appx. 627, 631 n.4 (conclusory allegations that a city failed to train its officers, without any factual allegations, insufficient to state Section 1983 claim); *Triano v. Town of Harrison, NY*, 895 F. Supp. 2d 526, 539 (S.D.N.Y. 2012) ("Plaintiffs has merely alleged that [defendant] failed to train its employees, without providing any

supporting factual detail about alleged deficiencies in the training program, or regarding other instances of police misconduct which could be attributed to a failure to train."). Accordingly, the Court dismisses Plaintiff's *Monell* claims against the City on the theory of failure to train.

For the reasons discussed above, the Court grants in part and denies in part the City Defendants' motion to dismiss Plaintiff's *Monell* claims against the City.

## II.   *Respondeat Superior* Claim

Finally, the City Defendants seek to dismiss Plaintiff's *respondeat superior* claim on the grounds that *respondeat superior* "is merely a theory of liability, and not a free-standing claim for relief." (City Defs. Mem. at 17.) Count VIII of the SAC asserts a stand-alone claim for *respondeat superior* liability against the City to hold it "liable as principal for all intentional torts committed by its agents." (SAC ¶¶ 175-178.) "*Respondeat superior* . . . is not a separate cause of action, but rather is a doctrine that permits the imputation of liability on a principal or employer for the act of an agent or employee." *Biberaj v. Pritchard Indus., Inc.*, No. 08 CIV. 07993 (PGG), 2009 WL 10738222, at *16 (S.D.N.Y. Sept. 28, 2009) (citations omitted); *see also Miller v. Cnty. of Erie*, No. 1:17-CV-00928 EAW, 2021 WL 4481195, at *9 (W.D.N.Y. Sept. 30, 2021) (collecting cases). As Plaintiff also asserts *respondeat superior* liability against the City in connection with his state law malicious prosecution claim (SAC ¶ 172), the Court dismisses Count VIII of Plaintiff's SAC. *Biberaj*, 2009 WL 10738222, at *16 (dismissing plaintiff's stand-alone *respondeat superior* claim, but permitting plaintiff to argue that such liability applies).

## III.   Leave to Amend

Lastly, Plaintiff seeks leave to amend his SAC in the event that the Court dismisses his claims. (Pl. Opp. at 21.) Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant

or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (internal quotation marks omitted). "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Here, Plaintiff amended his pleadings after the Court issued the Opinion dismissing his FAC. (*See* ECF Nos. 56, 57.) Generally, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257–58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim.") (alteration, footnote, and internal quotation marks omitted); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (per curiam) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted).

Moreover, in requesting leave to amend, Plaintiff does not state or otherwise suggest that he possesses factual allegations that may cure the deficiencies in his SAC. *See, e.g., TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to a different result).

Accordingly, the Court denies Plaintiff leave to file a Third Amended Complaint to replead the claims that the Court dismissed above.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the City Defendants' partial motion to dismiss. Specifically, the Court dismisses (1) Count VIII of Plaintiff's SAC for *respondeat superior* liability and (2) his *Monell* claim based on a failure to train.

The City Defendants are directed to file an Answer to the remaining claim in Plaintiff's Second Amended Complaint by April 26, 2024. Upon the City Defendants' filing of an Answer, the parties are then directed complete and file the attached Case Management Plan and Scheduling Order by May 17, 2024.

The Clerk of Court is directed to terminate the motions at ECF No. 63.

                                        SO ORDERED:

Dated: March 29, 2024
       White Plains, New York

                                        _____
                                              NELSON S. ROMÁN
                                            United States District Judge

UNITED STATES DISTRICT COURT                          Rev. May 2014
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

                                                    **CIVIL CASE DISCOVERY PLAN**
                              Plaintiff(s),          **AND SCHEDULING ORDER**

            - against -


                              Defendant(s).     _____ CV _____ (NSR)


-------------------------------------------------------------x

        This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with
counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

    1.      All parties [consent] [do not consent] to conducting all further proceedings before
            a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c).
            The parties are free to withhold consent without adverse substantive consequences.
            (If all parties consent, the remaining paragraphs of this form need not be
            completed.)

    2.      This case [is] [is not] to be tried to a jury.

    3.      Joinder of additional parties must be accomplished by _____.

    4.      Amended pleadings may be filed until _____. Any party
            seeking to amend its pleadings after that date must seek leave of court via motion.

    5.      Interrogatories shall be served no later than _____, and responses
            thereto shall be served within thirty (30) days thereafter.  The provisions of Local
            Civil Rule 33.3 [shall] [shall not] apply to this case.

    6.      First request for production of documents, if any, shall be served no later than
            _____.

    7.      Non-expert depositions shall be completed by _____.

            a.      Unless counsel agree otherwise or the Court so orders, depositions shall not
                    be held until all parties have responded to any first requests for production
                    of documents.

            b.      Depositions shall proceed concurrently.

            c.      Whenever possible, unless counsel agree otherwise or the Court so orders,

non-party depositions shall follow party depositions.

8.    Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9.    Requests to Admit, if any, shall be served no later than _____.

10.   Expert reports shall be served no later than _____.

11.   Rebuttal expert reports shall be served no later than _____.

12.   Expert depositions shall be completed by _____.

13.   Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14.   **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15.   Any motions shall be filed in accordance with the Court's Individual Practices.

16.   This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17.   The Magistrate Judge assigned to this case is the Hon. _____.

18.   If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19.   The next case management conference is scheduled for _____, at _____. (The Court will set this date at the initial conference.)

SO ORDERED.

Dated:

White Plains, New York

_____

Nelson S. Román, U.S. District Judge